# MOSES M. KELSEY, ADMR. V. JOHN KELLEY AND WIFE.

*Equity. Married woman. Voluntary conveyance in fraud of creditors. Evidence.*

1. In a suit in equity against a husband and wife to charge the separate property of the wife, an item for money paid on account of having become surety for the husband, should be disallowed, it not appearing that the liability was incurred at the request or upon the credit of the wife.

2. R. being desirous of living with the defendant wife, his daughter, expended money in repairs upon her house for his own convenience, and advanced her $200 in money. He afterwards boarded with her more than enough to exhaust the $200. It was not understood by either party that any money was to be paid R., and it was not found that the repairs materially enhanced the value of the premises. *Held*, that no indebtedness was created from the daughter to R. and that a creditor of R. could not charge her with the costs of the repairs.

3. Where one conveys his entire property conditioned for his life support, and the grantee does support him at an expense greater than the value of the property conveyed, a creditor cannot charge his debt upon the grantee after the death of the grantor, although that debt existed prior to the conveyance.

4. The question being as to the value of board, one who lives and keeps house in the vicinity may give his opinion in evidence.

This was a bill in chancery brought by the administrator of James Roberts against John Kelley and Malina Kelley, his wife, to charge the separate estate of the wife with certain indebtedness. Heard at the September term, 1889, Orleans County, upon pleadings, master's report and exceptions of both parties thereto. Taft, chancellor, decreed for the orator. The defendant appeal.

Malina Kelley was the daughter of James Roberts, and the orator claimed that his intestate had in life loaned his daughter certain sums which had never been repaid. By an amendment to his bill, made after hearing before the chancellor and before decree, he made the additional claim that if the said sums were gifts instead of loans, these were in fraud of the creditors, and therefore chargeable upon the estate of the daughter, which was the product of these gifts.

The orator claimed to recover in respect of four items.

1. The first item was for $200, paid by the intestate on account of the defendants, July 2, 1872. Roberts was surety on a note of John Kelley, payable at the National bank of Derby Line. This note was sued and a judgment obtained, and the payment was in satisfaction of this judgment. It did not appear that the wife was in any way liable on the note, or the judgment or that she requested Roberts to pay it.

2. The second item was for $468.25, $200 for money furnished by Roberts, and $268.25 for repairs by him upon the house of Malina Kelley. With reference to this item the master found :

"During the early part of the summer of 1874, James Roberts, wishing, with his wife, to live with his daughter Malina furnished defendants $200, and paid out in repairs on the West Derby house, besides that, $268.25. I find that James Roberts expected that this $200 would be taken up in board, and as he superintended the repairs, paid the men for doing the work, purchased and paid for the materials, and made the repairs to suit his own taste and convenience, consulting no one about them, and from his declarations while making them, and a variety of other circumstances, I am satisfied that it was not understood by either party that any money was to be paid Roberts. He boarded there about fifty weeks, which would amount to from $200 to $250. I am satisfied from the circumstances attending and following this transaction, and Roberts' declarations, that the parties regarded what said Roberts thus expended more than enough to pay his and his wife's board, was done by him and for his benefit. I therefore offset the board and disallow the remainder, subject to the opinion of the Court as to whether this disallowance

or offset may be made to the prejudice of the creditor, whose debts preceded all the transactions hereinbefore named."

3. The third item was for $1,200, $1,000 being cash paid towards the purchase of the Kelley farm and $200 for stock, tools, etc., used on that farm. The defendants admitted the receipt of these sums, but contended that they had more than paid them by support furnished Roberts and his wife. With reference to the circumstances under which these sums were advanced and the support furnished the master reported :

"On the 29th day of April, 1879, Emera Stewart, guardian of Geo. A. Roberts, conveyed the real estate described in a deed which is orator's exhibit 'F.' (which is referred to), to deft., Malina Kelley. The land and premises last described therein is the 'Kelley farm,' and is, and has been, the residence of the defendants since about the time it was purchased (April 29th, 1879), defendant John Kelley having the active management of it with defendant's sons, otherwise it has been treated as the specia property of defendant Malina. I find that at the time of the purchase of this farm, James Roberts paid $1,000 towards it, and the balance of the purchase money was paid by notes signed by both defendants, and payable to said Stewart, guardian as aforesaid, and so I allow it from April 29, 1879.

No evidence relating to interest was introduced upon any item. I find that James Roberts let defendants have the $200 charged in the last item on exhibit 'C', at various times, but at what particular times or in what amounts, there is nothing to show, and so I allow it from Nov. 4, 1884; making due to Roberts, December 1, 1879, from defendants, $1,200.

The $200 last mentioned was expended for stock, tools, hay and grain, and whatever was necessary to carry on and improve the farm, and which, with the other personal property and the farm, belongs to Malina. After leaving West Derby, Roberts moved to his place at Derby Centre, and his wife kept and took care of the house there with slight and occasional assistance from the neighbors, until 1879, when beginning to feel the feebleness and infirmities of age and requiring some care, Roberts made an arrangement, or rather went to live with defendants. They went there Dec. 1, 1879, and remained there until they died (she till Aug. 21, 1884, and he till Feb. 24, 1886). It is conceded that they were faithfully and kindly treated while at defendants'; they occupied two rooms separately; they were furnished by Roberts. When they went to the 'Kelley Farm' they required

about the same care that people of their age ordinarily require, with occasional sickness (they being in the vicinity of 80 years of age). The necessity for care and watchfulness gradually increased with their years until at the very last of their lives it was quite considerable. There does not seem to have been any definite arrangement or agreement or talk between the parties as to the terms on which these old people were to be boarded, further than the interview just preceding the giving the bond in which defendant Kelley told Roberts the money he had let them have was exhausted, and which I am soon to detail, and no figuring up or settlement was ever made between Roberts and the defendants or either of them. Roberts furnished the money towards buying the farm and expected to live with and be cared for by the defendants. Beyond this all the transactions between the parties seem indefinite, without purpose or design. It was one of those frequent unfortunate and indefinite transactions which occur among relatives."

4. The fourth item was for the amount of a $600 note known as the Hopkinson note. In relation to this transaction the master found:

"About the middle of March, 1884, defendant John Kelley told Roberts that the money he had let them have was exhausted, and that they must have some more, and Roberts replied he would 'see about it,' and turned and went away. Soon after he told Kelley (John) that he had no more money except in a note against David Hopkinson of six hundred dollars, and some pension money and rents, which two last he desired to reserve for his own use. Thereupon he asked defendants to sign the bond marked 'G. G. N. D.,' which is made a part of this report, and said bond was executed by defendants, in consideration that Roberts should give up and transfer the Hopkinson note to them, which note of $600 (the interest having been paid to Roberts), was paid to John Kelley by Hopkinson at once, and the money so paid on the note Kelley paid and applied on the notes given for the 'Kelley Farm.'"

In consideration of the transfer of the Hopkinson note to them the defendants executed a bond to Roberts conditioned to support Roberts and his wife during their lives. At the time this suit was brought Roberts and his wife had both deceased, and the master found that the defendants had maintained them according to the condition of the bond.

He also found that the actual value of the support furnished between Dec. 1, 1879, and March, 1884, the time when the Hopkinson note was transferred, was more than the $1,200 with interest, and between March, 1884, and their decease, more than the amount of the Hopkinson note with interest.

After the advance of the $1,200, Roberts had no attachable property except the Hopkinson note, and after the transfer of that note, none whatever. The debt of the creditor in whose interest this suit was prosecuted accrued in 1871.

Upon the question of what it was worth to board Mr. and Mrs. Roberts during this time, the master received, against the exception of the orator, the opinion of witnesses living and keeping house in the vicinity, but with no special experience as to the price of boarding.

*Dickerman & Young*, for the orator.

The conveyance of the $600 note by Roberts for his life support, being the conveyance of all his property without making provision for the payment of his debts, was void as to his creditors, and gave the defendants no title to the property as against existing creditors for whose benefit this suit is brought. *Crane* v. *Stickles and Tr.*, 15 Vt. 252-7; *Jones* v. *Spear and Tr.*, 21 Vt. 426-31; *Worthington* v. *Jones and Tr.*, 23 Vt. 549; *Church* v. *Chapin*, 35 Vt. 223 ; *McLane* v. *Johnson*, 43 Vt. 48.

The testimony of the witnesses as to the expense of boarding Roberts and wife was inadmissible. They were not experts. Laws. Exp. Ev. 195, 197.

*Prouty & Farrell, and Edwards & Burke*, for the defendants.

The $200 paid by Roberts as surety for Kelley cannot be charged upon the property of the defendant wife. *Priest* v. *Cone*, 57 Vt. 495; *Dale* v. *Robinson*, 51 Vt. 20; *Sargeant* v. *French*, 54 Vt. 384.

The orator is not entitled to a decree as to the $600 note. This conveyance was not fraudulent in fact. If fraudulent at all it was because as to creditors the consideration was not good. But when this suit was brought the consideration had become good; at that time the defendants had fully supported Roberts and wife during their lives, and at an expense greater than the value of the note. A voluntary conveyance, which is void as to creditors in its inception may become valid by matter *ex post facto.* Jones v. *Bryant,* 13 N. H. 53 ; *Rocker* v. *Abell,* 8 B. Mon. 566 ; *Wood* v. *Jackson,* 8 Wend. 25 ; *Verplank* v. *Sterry,* 12 John. 535 ; *Sterry* v. *Arden,* 1 John. Ch. 260 ; *Thomas* v. *Goodwin,* 12 Mass. 140 ; *Hutchins* v. *Sprague,* 4 N. H. 469.

If this conveyance had been fraudulent in fact, it would have been absolutely void. *McLane* v. *Johnson,* 43 Vt. 48 ; *Brackett* v. *Waite,* 4 Vt. 389 ; *Rut. & Bur. R. R. Co.* v. *Powers,* 25 Vt. 15.

An opinion as to the value of the board furnished Roberts and wife was properly received in evidence. It was like the value of property. Laws. Ev. 440, 443, 444; *Joy* v. *Hopkins,* 5 Denio 84; *Carter* v. *Carter,* 36 Mich. 207 ; *Shattuck* v. *Stoneham,* 6 Allen 117 ; *Clifford* v. *Richardson,* 18 Vt. 627; *Stone* v. *Tupper,* 58 Vt. 409.

The opinion of the court was delivered by

ROSS, J. The original bill proceeds upon the ground that the defendant, wife, had, in the lifetime of the intestate, her father, received from him, various sums of money, or loans, which she had not fully repaid, and the orator, as administrator, brings the bill to have the balance due ascertained, and made a charge upon the wife's real and personal property, that it may be available to him in the payment of the debts proved against the estate. He brings the bill in the interest of the creditors. After the master's report was filed, showing that none of the claimed sums were received by the wife as loans, the orator was allowed

to amend his bill, by setting forth that she received the various sums charged·in the original bill, which were found established by the master, under such circumstances that it would be fraudulent in law to allow her to retain the sums so received, against the creditors, who have proved their debts against the father's estate. When these transactions transpired, to lay the foundation for a charge in equity upon the wife's separate property, the money must have been advanced upon the credit of the separate property, and for its benefit, or for the personal benefit of the wife. *Dale* v. *Robinson*, 51 Vt. 20; *Priest* v. *Cone*, 51 Vt. 495.

I. Considering the scope of the bill, and the requisites necessary to constitute a charge in equity upon the wife's separate property, it is evident that the $200 paid by the intestate, as surety for the defendant husband, cannot be considered. The scope of the bill as amended, and the principles of equity law applicable to charging the wife's separate estate, do not permit a general accounting of all matters existing between the intestate and the defendants. They include such matters only as the wife is interested in, and as fall within the principle of the cases *supra*. It is not found that this sum was paid by the intestate upon the credit of the wife's property, or for its benefit, or for the wife's benefit; but it is found to have been paid by the intestate only as surety for the husband; and that it had no connection with the subsequent dealings between the intestate and the defendants, in which the wife or her property was interested.

II. The facts found by the master dispose of the $468.25 which the intestate let the wife have in money and which he expended in repairs· upon the house, in 1874. During that year the intestate and his wife boarded with the defendants. He let them have $200 in money, and laid out in repairs on the wife's house $268.25. The master has found that the board of the intestate and his wife was more than enough to pay the $200 which, he finds, the intestate expected would be taken up in board, and

that the intestate made the repairs " to suit his own taste and convenience, consulting no one about them," and that " it was not understood by either party that any money was to be paid the intestate, for the repairs; and that what was not paid in board, was done by the intestate and for his benefit." These facts fully sustain the disallowance of any part of this item by the master; especially when he has not found that the repairs materially enhanced the value of the premises, or were necessary. The facts found show that at this time the property owned by the intestate was more, in value, than required to pay all the debts proved against the estate. These facts leave no ground for the contention of the orator, that the balance of this item which remained unpaid by the board furnished the intestate and his wife, should enter into the accounting in connection with the subsequent items. The law does not imply a promise to pay for repairs made as these were, without expectation of payment, and without it being found that they were of a substantial benefit to the property.

III. In the spring of 1879 the defendant's wife purchased a farm and the intestate paid $1,000 towards it with the expectation that he and his wife should live with, and be cared for by, the defendants. From that time to the time of the death of the intestate and his wife, they did live with and were cared for by the defendants. At different times between the spring of 1879, and November, 1884, but at what times, or in what sums, is not found, the intestate furnished the defendant wife $200, which was invested in personal property, for her benefit, to be used on the farm. The master has not found that any part of the $200 was furnished subsequently to the arrangement made in March, 1884. He treats the $200 in the same way he does the $1,000, and has found no fact to show that it should be treated otherwise, except that he says that no evidence relating to interest upon any item was introduced, and that, as the particular times and amounts at and in which this item was furnished is not shown, he

allows it as of Nov. 4, 1884. From the manner in which the master has treated the $200, and from the facts he has found in regard to it, we do not think there is any just ground for the contention of the orator that this sum should be treated as furnished after the arrangement of March, 1884. If the master had so regarded it, he would not have treated it in connection with, and in the same way, he has treated the $1,000. Further than that the intestate and his wife expected to live with and be cared for by the defendants, " all the transactions between the parties seem indefinite and without design. It was one of those frequent unfortunate and indefinite transactions which occur among relatives." He finds that at a fair price for boarding the intestate and his wife, in March, 1884, this $1,200 had been more than expended, and the husband told the intestate that the money was all exhausted, and the intestate soon after entered into a further arrangement in regard to the future support of himself and wife. After the death of the intestate and his wife, and after the mouths of the defendants have become closed by the statute, it would be hazardous for the master or court to attempt to treat the matter of the $1,200, and board, differently from what the parties then treated it, or the board as a full equivalent for the money furnished. We think they should be so considered.

In March, 1884, the intestate advanced to the defendant wife $600 more by way of the Hopkinson note, which was used to make a further payment towards her farm, and took a bond from the defendants for the support of himself and wife during their natural lives. During the period covering all these transactions the defendant husband was insolvent. The defendants fully performed the condition of the bond, and, as found by the master, at an expense of more than the $600 received therefor. The debts proved against the estate and represented by the orator were all contracted by the intestate before the

transaction of 1879. By that transaction and the transaction of 1884 the intestate disposed of substantially all his property for the support of himself and wife, without making any provision for the payment of these debts. The orator contends that this disposition of his property was, in law, fraudulent, as regards these creditors, although good between the parties, and although the defendants' agreement to support the intestate and his wife was, as between the parties, an ample and valid consideration for the money advanced. This contention is fully supported by the authorities cited.. *Crane* v. *Stickles*, 15 Vt. 252 ; *Jones* v. *Spear and Tr.*, 21 Vt. 426 ; *Worthington* v. *Jones and Tr.*, 23 Vt. 549 ; *Church* v. *Chapin*, 35 Vt. 223.

The other case cited, *McLane* v. *Johnson*, 43 Vt. 48, is one of fraud in fact, and not in law, and not applicable. The other cases proceed upon .the ground that it is the legal duty of a debtor to pay his debts rather than provide for the future support of himself and family, and that existing creditors may avail themselves of property conveyed for future support for the payment .of their debts. The creditor can avoid such conveyances only because the debtor has no other property out of which payment can be enforced. In none of these cases, and in no case to which our attention has been called, has it been held that the creditor could wait until the support had been furnished, and the contract fully executed by both parties, and then recover enough of the value of the property conveyed for the support to pay his debt. In all the cases cited, the identical property, conveyed in consideration of future support, or some of it, was taken and appropriated by the creditor, except the case in the 15th Vt., and in that case, it is. said, " Perhaps the judgment of the County Court would have been more technically correct, if it had adjudged them trustees for the specific articles of personal property which they had received of the defendant, instead of adjudging them trustees generally," plainly indicating the course of proceeding which was followed in the other cases. This is a case in

equity, in which the orator must do, as well as receive, equity. The master has not found that these transactions between the intestate and these defendants were tainted with fraud in fact, nor does the bill charge fraud in fact. If now, after the defendants have fully supported the intestate and his wife, at an expense greater than the money received, the orator can compel a return of the money received sufficient to pay the creditors represented by the orator, these defendants are left with a debt of an equal amount, also provable against the estate represented by the orator. Why should the creditors represented by the orator receive payment more than the defendants? The defendants have been guilty of no wrong in supporting their father and mother, nor was it any more a wrong for them to receive payment for such support than for the creditors represented by the orator to receive payment for their debts. These creditors did not know of the existence of the property received by the defendants for the support, and did nothing on the strength of its existence. On the other hand the defendants knew of it, and furnished the support for it. If they had furnished the support before receiving payment therefor, and then received the same property which they did receive, no one would claim that the orator could recover the property back, to pay the creditors represented by him. If the creditors represented by the orator had intervened before the defendants had furnished the support, they would have had the better right to the property, and the defendants have sustained no damage. Their intervention would have released the defendants from the contract to furnish further support. The consideration for this contract further to support would have been taken away. The defendants until they had furnished the full support, were like a purchaser *bona fide* in every respect, except he had not fully paid the contract price of the property purchased, where he must be a *bona fide* purchaser for value, to be protected in his purchase, if otherwise a *bona fide* purchaser, he is protected only to the extent he has paid value.

Kelsey *v.* Kelley and Wife.

But although he does not pay full value at the time of the purchase, if such payment is made in full, before he is made aware of the infirmity of his purchase, he is fully protected. We think this principle applicable between the orator and these defendants, especially the wife, on the facts of this case. Conveyances of property to secure future support, until the support is furnished have the infirmity of voluntary conveyances, or conveyances for which a full, valuable consideration is not paid at the time the conveyance is made. It is well settled that supineness of a creditor to attack and have such conveyances set aside may defeat his right. *Eigleberger* v. *Kibler*, 1 Hill (S. C.) Ch. 113, (26 Am. Dec. 192.) Such conveyances may be validated by *ex post facto* acts. *Verplanck* v. *Sterry*, 12 Johns. 536, (7 Am. Dec. 348.)

While these cases are not analogous in their facts to the facts in the case at bar, we think this case is controlled by the same equitable principles. When this suit was brought, in principle, the defendants stood related to the money received for the support of the intestate and wife, in equity, just as they would if they had first furnished the support, and then received the money in payment therefor. The intestate then might well prefer them, in making payment of his debts, to the creditors represented by the orator.

We notice nothing in the testimony excepted to, that was inadmissible in substance.

*The decree of the court of chancery is reversed, and the cause remanded with a mandate to dismiss the bill with costs to the defendants.*